***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Ledford, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 28 March 2001 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Defendant-employer is self-insured, with Allied Claims Administration, Inc. acting as the servicing agent for the employer at all relevant times herein.
3. On June 2, 1997, Plaintiff was employed by Defendant-employer as a housekeeper.
4. The Plaintiff-employee's average weekly wage was $198.80, yielding a compensation rate of $132.54.
5. The Plaintiff-employee sustained an admittedly compensable, work-related injury on June 2, 1997. On July 10, 1997, Defendants accepted the Plaintiff's claim as compensable pursuant to a Form 60.
6. The Plaintiff was released to return to work without restrictions, and did in fact return to her regular work duties on December 3, 1997.
7. A Form 28B was filed with the Industrial Commission on February 23, 1998 indicating that Plaintiff received temporary total disability compensation from June 19, 1997 through September 6, 1997, and then temporary partial disability compensation from September 7, 1997 through October 18, 1997. The Form 28B indicated that the last payment of indemnity benefits was made to the Plaintiff on October 27, 1997 and the last payment of medical compensation was on February 12, 1998.
8. The Plaintiff was discharged by the Defendant-employer on July 16, 1998. Since being discharged by the Defendant-employer, Plaintiff has returned to work part-time for the U.S. Census Bureau from November 9, 1998 to January 4, 1999, from June 9, 1999 to August 15, 1999 and February 27, 2000 to March 11, 2000. Plaintiff has been unemployed since March 11, 2000.
9. Plaintiff filed a Form 33 Request that Claim be Assigned for Hearing on July 5, 2000, seeking indemnity compensation for the dates she has not been employed since her termination, payment for a psychological evaluation performed by Dr. Christy Jones in December 1998, and permanent and total disability compensation.
10. The parties stipulated all medical records are relevant and admissible, and reserved the right to depose the medical care providers. The parties provided the Deputy Commissioner with a stipulated packet of medical records at the hearing before the Deputy Commissioner.
 ***********
Based upon all the evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the Plaintiff was 47 years of age. She lives with her husband, her teenage daughter and a young grandchild in Atkinson, North Carolina. Plaintiff dropped out of high school prior to completing the ninth grade and later completed her high school equivalency degree at the age of 31. According to her school records, Plaintiff had "difficulty distinguishing between imagery and factual material." In addition to her G.E.D., Plaintiff has taken 3 separate child-parenting classes and one word processing class.
2. Plaintiff had worked for the employer as a housekeeper for approximately 4 years prior to her work injury of June 2, 1997. As stipulated by the parties, on June 2, 1997, Plaintiff sustained a compensable injury arising out of and in the course and scope of her employment as a housekeeper. Plaintiff was sitting in a chair and vacuuming under a desk when the chair slipped out from under her causing her to fall to the floor and bump the desk behind her. A bookcase positioned on top of the desk fell onto Plaintiff, striking her in the head.
3. Plaintiff immediately sought evaluation and treatment at the emergency department of Pender Memorial Hospital. At that time, it was noted that Plaintiff had a hematoma present on the top of her head but that there was no bleeding. Plaintiff denied any loss of consciousness and was noted to be alert and oriented x 3. Her Glasgow Coma Scale score was perfect. Plaintiff's complaints consisted of dizziness and headache. She was discharged with a diagnosis of a hematoma of the scalp.
4. Plaintiff returned to the emergency department the following day and her diagnosis remained unchanged. A skull series was ordered which was normal, and her neurological signs remained perfect. A CT Scan of the brain was ordered and completed on June 4, 1997, which was read as being within normal limits.
5. On or about June 4, 1997, Plaintiff presented herself to her family physician, Dr. Daniel Zinicola complaining of headaches. Dr. Zinicola subsequently referred Plaintiff to Dr. Susan Torres, a board-certified neurologist.
6. On June 25, 1997, Plaintiff was examined by Dr. Susan Torres. At that time Plaintiff was complaining of headaches, dizziness, loss of balance, sensitivity to light, and feeling grouchy. Dr. Torres found that Plaintiff's neurological exam was entirely normal. Dr. Torres' assessment was that Plaintiff was suffering from post head trauma, headaches, and mild post-concussion syndrome. Dr. Torres advised Plaintiff to discontinue use of Elavil and prescribed Prozac as well as Midrin prn for headaches. She advised that Plaintiff should remain out of work until further notice.
7. Plaintiff's claim was accepted on a Form 60 dated July 10, 1997 that listed her average weekly wage as being $198.80. Plaintiff was paid temporary total disability compensation for this time out of work at the rate of $132.54 per the Form 60.
8. On August 4, 1997, Dr. Torres noted that Plaintiff was "doing a lot better", but that she was continuing to complain of headaches, dizziness and blurred vision. Dr. Torres found the Plaintiff's continued subjective complaints did not correspond to her physical exam and therefore believed several referrals were warranted. Dr. Torres referred Plaintiff to Dr. Molly Allen for an ophthalmological evaluation, as well as to Coastal Rehab Hospital for a balance master test to evaluate her complaints of decreased balance. As of that date, Dr. Torres released the Plaintiff to return to light duty work up to 4 hours per day. Since the employer was unable to accommodate her at that time, Plaintiff continued to receive disability compensation.
9. On September 4, 1997 Plaintiff returned to Dr. Torres, with continued complaints of headaches. By this time, Dr. Torres was beginning to think that the Plaintiff's continued headaches were not related to her work injury, since, in her opinion, post-head trauma headaches typically last for several weeks, and at the most several months. In her notes, Dr. Torres commented that typically the headaches are very frequent and intense following the trauma, and then rapidly improve with decreased intensity and frequency. Dr. Torres again reiterated that Plaintiff was able to return to light duty work at that time, and outlined some housekeeping tasks that she was capable of performing.
10. On September 5, 1997, Plaintiff had an eye examination conducted by Dr. Molly Allen, a Diplomat of the American Board of Ophthalmology and a Fellow of the American Academy of Ophthalmology. Dr. Allen assessed Plaintiff as having a mild refractive error and early presbyopia, which is a degenerative change, and prescribed glasses for her. Dr. Allen found "no neurophthalmologic abnormalities and no pathology or trauma from an eye standpoint that would explain her symptomology" and also noted that "the dramatics this patient displayed make me feel that there is some malingering as well."
11. By September 25, 1997, Dr. Torres noted that Plaintiff reported significant improvement in her headaches and vision. At that time, Plaintiff told Dr. Torres that she was working four hours per day on light duty with no difficulties. Dr. Torres stated that the Balance Master results indicated that Plaintiff evidenced "poor use of sensory inputs" which she related to her impaired vision. Dr. Torres noted that the results of the Balance Master had likely been tainted since the Plaintiff insisted upon wearing dark sunglasses during the testing. Dr. Torres also encouraged Plaintiff to get her eyeglass prescription filled.
12. On October 27, 1997 the Plaintiff returned to Dr. Torres stating that she had resumed her regular duties at work, and had experienced no problems. Dr. Torres noted that Plaintiff had not yet gotten her previously prescribed eyeglasses and had also begun self-medicating by taking Darvocet prn. Dr. Torres advised Plaintiff that the Darvocet prn had not been prescribed to her and could likely cause her to have further problems. Dr. Torres further reduced the Plaintiff's work restrictions at that time.
13. On October 31, 1997 and November 12, 1997, the Plaintiff underwent MMPI-2 testing performed by Dr. Christy Jones, a board-certified Neuropsychologist, at the request of Dr. Torres. Dr. Torres had requested the testing to determine the extent to which psychiatric distress might be contributing to the Plaintiff's overall cognitive functioning and complaints of pain.
14. Dr. Jones interpreted the Plaintiff's MMPI-2 results as indicating a person with a conversion profile. A conversion disorder is manifest by a person's focus on perceived physical symptoms, which they actually believe they have, but which may have no underlying basis. The person focuses on these symptoms rather than the underlying psychological problems. Dr. Jones also noted that Plaintiff's presentation of symptoms was exaggerated and hysterical for secondary gain, which would be consistent with Dr. Allen's assessment of possible malingering, in which the person is consciously pretending to have symptoms they do not have. Dr. Jones assessed Plaintiff as mildly to moderately depressed. She recommended further neuropsychological evaluation to rule out possible changes in cognitive functioning as a result of the Plaintiff's work injury.
15. At her December 2, 1997 visit to Dr. Torres, the Plaintiff reported working more, and that she was doing "okay." However, Plaintiff also reported that she was having problems with getting lost while driving, but then stated she had never been in any danger and had always ended up where she was supposed to be. Dr. Torres released Plaintiff to return to her regular duties without any work restrictions at that time.
16. Dr. Torres last saw the Plaintiff on January 9, 1998. At that time, Dr. Torres found that the Plaintiff had reached maximum medical improvement. During this visit, Plaintiff told Dr. Torres that she had returned to full time duties at work, and that she had experienced no problems whatsoever. Dr. Torres indicated in her notes that Plaintiff had a complete resolution of her symptoms and that she had sustained no permanent impairment as a result of her work-related injury.
17. During her deposition Dr. Torres testified that in her opinion, people with post-concussion syndrome normally have a resolution of their symptoms within weeks, and at most a couple of months, following the trauma that precipitated the concussion. Dr. Torres stated that headaches associated with post-concussion syndrome do not "come and go", but instead would have a gradual improvement of symptoms until they were completely resolved. Even with the most severe concussions, the symptoms would show signs of steady and gradual improvement, and would not remain constant and/or vary over time.
18. Dr. Torres further testified that it was her opinion that the Plaintiff did have a very mild post-concussion syndrome following her work injury of June 2, 1997. However, by January 9, 1998 all of her symptoms had totally resolved and that any further headaches or reported symptoms were not related to her prior work injury.
19. The greater weight of the evidence at hearing showed that following her unrestricted release to return to work, the Plaintiff continued to perform her regular job duties until being terminated on July 16, 1998. Plaintiff worked full-time from approximately January 9, 1998 until July 16, 1998 without reporting any further medical problems to the Employer.
20. The Plaintiff was terminated due to an altercation with a patient, which she denied. Subsequently, Plaintiff retained her current attorney on July 21, 1998 to assist her in appealing her termination pursuant to the Employer's grievance policies, but her termination was upheld. The greater weight of the evidence shows that the Plaintiff's termination was for reasons unrelated to her work-related injury.
21. The Plaintiff testified that following her release to return to work in September 1997, and even after being terminated by Employer in July 1998, she continued to suffer from constant headaches, dizziness and loss of balance, and that she had problems with her memory, at work and especially while driving. However, this testimony is not supported by the greater weight of the evidence. Plaintiff did not relate these complaints to Dr. Torres at her last visit in January 1998. There is no other evidence to indicate she had problems driving. Following her termination, she engaged in work for the Census Bureau, which required driving.
22. The Plaintiff's daughter, Sharon Hayes, testified that her mother had frequently complained of headaches, irritability and memory problems since her work injury of June 2, 1997. However, Ms. Hayes indicated that her mother took care of her minor children for her during the day while she worked, and indicated that she had no concerns for her children's safety, or her mother's ability to provide proper and adequate care for her children.
23. Mary Stringfield, Plaintiff's co-worker, testified that she had worked with her for several years and could recall assisting the Plaintiff with her job duties but could not provide any timeframe during which this occurred. Ms. Stringfield further testified that all of the housekeepers on their floor assisted one another with their respective duties and that this was not uncommon. Her testimony does not support the Plaintiff's claim that she was unable to perform the duties of her employment when she returned following her injury.
24. Ms. Maureen Foote, a vocational rehabilitation counselor with the North Carolina Department of Vocational Rehabilitation, testified that Plaintiff's attorney had referred the Plaintiff to her for rehabilitation assistance in July 1999. Ms. Foote testified that her agency assisted individuals with physical disabilities in returning to work. Ms. Foote expressed her opinion that the Plaintiff was not employable in the open job market, but could return to work in a "supportive employment" environment. Ms. Foote cited her concerns that the Plaintiff would have problems driving. However, the greater weight of the evidence showed that the Plaintiff continued to drive herself around, even when alone, and even though she reported getting lost while driving was always able to get to her desired destination.
25. Ms. Foote admitted that she is not normally involved with rehabilitation efforts in a workers' compensation setting. While she had met with the Plaintiff on two separate occasions, Ms. Foote had not performed any vocational testing or assessment of the Plaintiff, but instead relied on a previously prepared report. On cross-examination Ms. Foote readily admitted that she had not known that the Plaintiff had already returned to work at the time she had met with her. Therefore, her opinions about the Plaintiff's ability to work and drive were inaccurate. For these reasons, the undersigned finds that Ms. Foote's testimony is not persuasive.
26. Ms. Leslie Silva, the medical case manager assigned to work with the Plaintiff, had been a rehabilitation specialist for more than fifteen years and worked as a nurse for eight years before that. Ms. Silva testified that at first she had concerns that the Plaintiff was genuinely injured. However, her testimony shows that during the year and a half she was assigned to the Plaintiff's case, Ms. Silva grew increasingly skeptical of the Plaintiff's claims. Ms. Silva also testified that on a visit to the Plaintiff's workplace, her co-workers advised her that the Plaintiff had always demonstrated her current symptoms and behaviors, even before her work injury. Ms. Silva also testified that the Plaintiff self-medicated herself using over the counter medications and prescription drugs she had had from prior prescriptions, contrary to her physician's orders.
27. Ms. Silva testified that in her 23 years of experience in the medical field she had worked with many individuals with head injuries. She perceived that the Plaintiff was exaggerating or dramatizing her symptoms. Ms. Silva also testified that in her opinion as a rehabilitation specialist, Plaintiff had not sustained a closed-head injury of any significance and had no recognizable cognitive deficits or problems resulting from her June 2, 1997 injury.
28. Ms. Sarah Stout, the Allied Claims Administration, Inc. Claim Representative assigned to this file, filed a Form 28B on February 23, 1998 because Plaintiff had been released from medical treatment at maximum medical improvement, assigned a zero (0%) percent impairment rating and had returned to her regular job duties on a full-time basis. Ms. Stout testified that after submitting the Form 28B she had no further contact with the Plaintiff, or anyone acting on her behalf, until being contacted by her attorney in July 1998. Ms. Stout indicated that despite numerous requests from the Plaintiff's attorney, she did not reinstate her indemnity benefits or otherwise agree to pay for medical expenses. She did agree to send the Plaintiff to Dr. Margit Royal, a board-certified Neurologist, for a second opinion with respect to her zero (0%) percent impairment rating assigned by Dr. Torres.
29. The greater weight of the evidence shows that the Plaintiff has not sought medical treatment for her reported symptoms since January 9, 1998. The greater weight of the evidence indicates that she has not suffered ongoing symptoms related to her work-injury that would necessitate medical treatment.
30. Subsequent to being terminated, the Plaintiff returned to work on three separate occasions with the U.S. Census Bureau, working a total of 62 days. She worked as a census taker, which required her being able to drive, follow directions, complete questionnaires and interact with people. She last worked for the Census Bureau in April 2000. Plaintiff was able to set her own schedule while she worked with the Census Bureau, and was reportedly a good employee. As set out in the stipulated exhibits, while she was employed with the Census Bureau the Plaintiff earned approximately $4,519.58.
31. The Plaintiff testified and indicated in discovery responses that she was injured on March 11, 2000 while working for the Census Bureau, but that she had never reported her injury. As she was walking up the steps of a house on Bell and Williams Road to leave a questionnaire, she stumbled and lost her balance falling against the side of the house. Plaintiff reported being numb from the waist down and unable to walk. After a few minutes, she was able to walk slowly back to her car and drive herself home without further incident. After this incident she decided that she could no longer do that type of work.
32. Other than this employment with the Census Bureau, the Plaintiff has not returned to work since being terminated by the Defendant-employer. The greater weight of the evidence shows that the Plaintiff has not conducted a reasonable job search and therefore has not shown that she is incapable of finding gainful employment.
33. On or about December 7, 1998, the Plaintiff returned to Dr. Christy Jones at the request of her attorney. Dr. Jones performed neuropsychological testing and administered a second MMPI-2 personality assessment in order to determine whether Plaintiff had sustained any traumatic brain injury as a result of her June 2, 1997 work injury. Defendants did not authorize, nor did they pay, for this evaluation. At that time, Plaintiff was working 20 to 40 hours per week for the Census Bureau.
34. The psychological testing indicated that the Plaintiff had low-average intellectual functioning consistent with her estimated premorbid intellectual functioning. All of Plaintiff's standardized neuropsychological test results suggested normal range functioning or performance consistent with pre-injury functioning. Dr. Jones interpreted the results to be suggestive of a possible expressive speech impairment, which she stated could be the result of the work injury. However, Dr. Jones admitted during her deposition that she had not reviewed or requested any information about the Plaintiff's pre-morbid abilities prior to reaching her conclusions during either of her exams.
35. Dr. Jones interpreted the second MMPI-2 results to be suggestive of chronic brain syndrome associated with brain trauma. However, she noted that the modal diagnosis was conversion reaction. There were no real significant findings with respect to the neuropsychological testing. Dr. Jones assessment was that the overall results of the neuropsychological evaluation suggested that "Ms. Hayes probably suffered a mild closed head injury that has basically resolved itself." Dr. Jones noted some language deficit that could be related to the injury, but which would not impair the Plaintiff's ability to function in most job settings. Dr. Jones later testified, consistently with this report, that the mild head injury was resolved, except for some possible language problems. She found the Plaintiff was mildly to moderately depressed and recommended treatment for the depression. Although she believed the depression could affect the Plaintiff's ability to work, Dr. Jones acknowledged that Plaintiff could probably work physically and that the fact she worked for the Census was evidence of this ability.
36. On August 2, 1999 and September 3, 1999, the Plaintiff was evaluated by Dr. Barbara McDonald, a physiatrist, at the request of her attorney and Ms. Maureen Foote. Upon examining the Plaintiff, Dr. McDonald found that her mental status examine was suggestive of being alert and oriented x 3, and memory of 3 x 3. Dr. McDonald noted some concern with how forthcoming Plaintiff was being with her, and indicated she had to obtain much of her background information from Ms. Maureen Foote. Dr. McDonald diagnosed Plaintiff with "mild concussive syndrome following her mild brain injury." Dr. McDonald was of the opinion that the Plaintiff was capable of work, but stated she should not be driving based on the information provided to her by Ms. Foote. However, as noted previously, this was inaccurate information.
37. On January 11, 2000, the Plaintiff presented herself to Dr. Margit Royal, a board-certified expert in Neurology, for the purposes of determining whether she had any cognitive deficits as a result of her work injury. Dr. Royal found that there was no significant neurological pathology nor any life or health-threatening or permanent organic damage or disease resulting from Plaintiff's work injury. Dr. Royal also stated that the Plaintiff demonstrated no memory disturbance and felt that her complaints of gait and balance difficulty were nonorganic in etiology.
38. Dr. Royal testified that had the Plaintiff sustained a true closed-head injury, her initial presentation for treatment would have noted a low score on the Glasgow Coma Scale. The fact that she scored perfect at her initial presentation, and at subsequent presentations, tended to cast doubt on the severity and extent of her injuries. Dr. Royal's expert medical opinion was that the Plaintiff suffered from conversion disorder and/or was malingering. Dr. Royal stated that no further testing or medical treatment should be considered because Plaintiff had no objective finding to substantiate any significant organic damage or injury. Dr. Royal also felt that Plaintiff was capable of working and had not sustained any permanent impairment as a result of her work injury of June 2, 1997.
39. On April 5, 2001 Dr. Verne Schmickley, a licensed rehabilitation psychologist with 30 years experience, reviewed the Plaintiff's medical records, employment records, academic records, and conducted his own examination of Plaintiff. Dr. Schmickley administered another MMPI-2 personality assessment to the Plaintiff. Dr. Schmickley found that Plaintiff was alert and oriented x 3. He also noted that she was able to drive herself to Wilmington, North Carolina alone and without assistance. During his examination, she was able to follow and understand his questions and directions.
40. Dr. Schmickley interpreted the MMPI-2 results as being suggestive of a person with conversion disorder or somatization disorder. Dr. Schmickley noted that the results of the third MMPI-2 were consistent with the MMPI-2 results administered by Dr. Jones originally in 1997. Dr. Schmickley agreed with the opinions of Dr. Torres, Dr. Royal and the initial opinion of Dr. Jones in finding no evidence of neurocognitive injury or deficit resulting from the Plaintiff's work injury of June 2, 1997. Dr. Schmickley opined that the Plaintiff had not suffered a neurological injury, and was instead expressing pre-existing psychological and personality problems via her subjective symptoms. He assessed Plaintiff with a Dysthymic Disorder, existing as far back as adolescence, and co-existing with her poor academic performance. He believed her depressive disorder existed as far back as her childhood.
41. Dr. Schmickley indicated that it was his expert medical opinion that while Plaintiff did have mental health issues, these were not caused, exacerbated, accelerated, nor aggravated by her work injury of June 2, 1997. Dr. Schmickley also noted that there were no findings that would suggest that the Plaintiff was disabled from gainful employment at any time since her injury.
42. The greater weight of the medical and psychological evidence fails to establish that Plaintiff sustained a significant closed head injury with any neurological injury. Even if she sustained a closed head injury, it had been resolved with no residual impairment by December 1998, when Plaintiff underwent neuropsychological testing by Dr. Jones. The only possible deficit was a speech problem, which can not be established as caused by the work injury and which did not impact her employability.
43. The Plaintiff has failed to prove that she is now, or has at any time since her release to return to work without restriction on January 9, 1998, been disabled as a result of her work-related injury of June 2, 1997. The testimony of the physicians and the psychologists shows that the Plaintiff is capable of gainful employment.
44. The evidence fails to establish that any ongoing mental problems suffered by the Plaintiff, including her depression, are related to her work-related injury of June 2, 1997. It appears that the depression is a long-standing disorder, evidenced in her earlier life, and as assessed by Dr. Schmickley.
45. Compensation and/or medical benefits for the Plaintiff were last paid on or about February 12, 1998. The evidence fails to show that Plaintiff is entitled to any further compensation benefits or medical benefits on account of her work-related injury of June 2, 1997.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned enters the following:
 CONCLUSIONS OF LAW
1. The Plaintiff sustained an admittedly compensable injury by accident on June 2, 1997. N.C. Gen. Stat. § 97-2(6). Defendants admitted liability for this injury pursuant to a Form 60. See Sims v.Charmes/Arby's Roast Beef, slip op. (COA99-1402, filed 6 February 2001).
2. The Plaintiff was released to return to unrestricted work by her treating physician on December 3, 1997. N.C. Gen. Stat. § 97-29.See Harrington v. Adams-Robinson Enterp., 349 N.C. 218 (1998).
3. After being released to return to unrestricted work, the Plaintiff did in fact return to her normal job duties at the same or greater wages as before her injury. Therefore, she was no longer totally or partially disabled within the meaning of the Workers' Compensation Act. N.C. Gen. Stat. §§ 97-29, 97-30. As a result of her unrestricted return to work, the Plaintiff has the burden of proving further disability before she would be entitled to additional workers' compensation benefits on account of her work-related injury of June 2, 1997. Harvey v. RaleighPolice Dep't, 96 N.C. App. 28, cert. denied, 326 N.C. 706 (1989).
4. Plaintiff has failed to prove that she is unable to earn wages in gainful employment due to any work-related injuries. She is therefore not entitled to further workers' compensation benefits. It is not necessary for Defendants to refute her claim of disability. N.C. Gen. Stat. §97-29; See Hundley v. Fieldcrest Mills, 58 N.C. App. 184 (1982). Seealso, Russell v. Lowes Food Prod. Distrib., 108 N.C. App. 762, (1993).
5. The evidence showed that the Plaintiff's termination on July 16, 1998 was unrelated to her work injury of June 2, 1997, but was due to misconduct or fault for which a non-disabled employee would also have been terminated. Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228
(1996).
6. Following her unrestricted return to work and subsequent to her termination, Plaintiff failed to conduct a reasonable job search and is therefore not entitled to further workers' compensation benefits. Russellv. Lowes Food Prod. Distrib., 108 N.C. App. 762 (1993).
7. As a matter of law, the Plaintiff's right to medical compensation terminated on February 12, 2000, two years after the Defendants last paid any medical or indemnity compensation on behalf of the plaintiff as a result of her work-related injury of June 2, 1997. N.C. Gen. Stat. § 97-25.1.
8. As a matter of law, the Plaintiff's right to indemnity benefits terminated on February 12, 2000, two years after the date Defendants last paid any medical or indemnity compensation to Plaintiff as a result of her work-related injury of June 2, 1997. N.C. Gen. Stat. § 97-47.
9. As a matter of law, the Plaintiff is not entitled to any additional benefits under the Workers' Compensation Act on account of her work-related injury of June 2, 1997. N.C. Gen. Stat. § 97-2 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. The Plaintiff's claim for additional workers' compensation benefits on account of her work-related injury of June 2, 1997 is hereby DENIED.
Each side shall pay its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER